UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

THOMAS RONK,                              )
                                         )
              Plaintiff,                  )
                                         )
        v.                                )  Civil Action No. 07-1662 (HHK)
                                         )
CONDOLEEZA RICE,                          )
  Secretary, U.S. Department of State,    )
                                         )
              Defendant.                  )
_____)

## DEFENDANT'S MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT

Pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure, Defendant, Condoleeza Rice, Secretary of State, by and through undersigned counsel, respectfully moves to dismiss Plaintiff's Complaint. This Court lacks subject matter jurisdiction to adjudicate this action because Plaintiff was not an employee of the Department of State for purposes of Title VII at the time of the alleged violations at issue in this action. In the alternative, Defendant moves the Court, pursuant to Rule 56 of the Federal Rules of Civil Procedure, for an order granting Defendant summary judgment on the grounds that no genuine issue of material fact exists and Defendant is entitled to judgment as a matter of law.[1]

---

[1] Plaintiff should take notice that any factual assertions contained in the documents in support of this motion may be accepted by the Court as true unless the plaintiff submits his own affidavit or other documentary evidence contradicting the assertions in the documents. See Neal v. Kelly, 963 F.2d 453, 456-57 (D.C. Cir. 1992), Local Rule 7(h); 56.1 and Fed. R. Civ. P. 56(e), which provides as follows:

> Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein. Sworn or certified copies of all papers or parts thereof referred to in an affidavit shall be attached thereto or served therewith. The court may permit affidavits to

In support of this Motion, Defendant respectfully submits the attached memorandum of points and authorities with exhibits, a statement of material facts as to which there is no genuine dispute, and a proposed order.

Respectfully submitted,

_____/s/_____
JEFFREY A. TAYLOR, D.C. BAR # 498610
United States Attorney


_____/s/_____
RUDOLPH CONTREREAS, D.C. BAR # 434122
Assistant United States Attorney


_____/s/_____
KAREN L. MELNIK, D.C. BAR # 436452
Assistant United States Attorney
United States Attorney's Office
Civil Division
555 4th Street, N.W.
Washington, D.C. 20530
(202) 307-0338

---

be supplemented or opposed by depositions, answers to interrogatories, or further affidavits.  When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.  If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

Fed. R. Civ. P. 56(e).

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| THOMAS RONK, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 07-1662 (HHK) |
| | ) | |
| CONDOLEEZA RICE, | ) | |
| Secretary, Department of State, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## DEFENDANT'S STATEMENT OF MATERIAL FACTS AS TO WHICH THERE IS NO GENUINE DISPUTE

Pursuant to Local Rule 7(h), Defendant respectfully submits this statement of material facts as to which there is no genuine dispute.

1.      Plaintiff served from 2003 until June 30, 2005 as a Senior English Language Fellow ("ELF") in Indonesia pursuant to a sub-grant from the School for International Training ("SIT"), a grantee of the Department of State, Office of Educational and Cultural Affairs ("ECA") and/or Embassy Jakarta.  See Complaint at 2; Declaration of John Alan Connerley ("Connerley Decl.") at ¶ 6-7.

2.      During calendar years 2003, 2004, and 2005, the ELF program operated as follows: Congress funded ECA through an appropriation distinct from other Department of State appropriations.  The Office of English Language Programs granted a portion of these appropriated funds to SIT pursuant to a formal grant agreement.  SIT, in turn, solicited applications from prospective ELFs, who were to be their grantees (and hence sub-grantees of the Office of English Language Programs) for a period of one year.   SIT was fully responsible for recruiting

ELFs.  See id. at ¶ 6.

3.    Because Embassy Jakarta wanted to ensure that ELFs would be available to serve
      in Indonesia, it had decided to use a portion of its Economic Support Funding
      ("ESF") to fund a separate ELFellow grant to SIT.  While this infusion of funds
      permitted SIT to recruit a greater number of ELFs, the ELF program as a whole
      continued to operate as it always had, i.e., SIT recruited prospective fellows and,
      if hired, they were awarded grants by SIT.  See id. at ¶ 7.

4.    There was no distinction between ELFs funded out of the core ECA grant and
      ELFs funded out of the Embassy Jakarta grant, except that ELFs funded out of the
      Embassy Jakarta grant were assigned to Indonesia.  See id.

5.    Embassies in countries around the world seek out local partner institutions (e.g.
      universities) and draft proposals describing the work that could be done with those
      partner institutions to improve English instruction in their countries were an ELF
      dispatched there.  See id. at ¶ 9.

6.    The Office of English Language Programs ("ELP") either accepts or rejects these
      proposals in consultation with the Regional Bureaus.  If ELP accepts a proposal,
      the granting organization (during all relevant times, SIT) creates and submits to
      each embassy a roster of candidates it deems qualified and who have expressed an
      interest in serving in the country where that embassy is located.  The embassy
      ultimately selects the candidate or candidates.  See id. at ¶ 10.

7.    The granting organization pays each ELF's stipend.  The granting organization,
      with input from the embassy, also establishes the cost-of-living adjustment

2

(COLA) for which a particular ELF is eligible based on the conditions in the country where he or she is to be assigned, and pays each ELF their COLA. <u>See</u> <u>id.</u> at ¶ 11.

8.     ELFs in particular countries may be eligible for additional benefits (including financial) either from the embassy or the partner institution. <u>See</u> <u>id.</u> at ¶ 12.

9.     The partner institution in a particular country often furnishes the home or apartment where an ELF lives and affords him or her office space and equipment. <u>See</u> <u>id.</u> at ¶ 13.

10.    ELFs do not accrue annual leave from the Department of State. Rather, ELFs may only take leave with the prior approval of the partner institution. <u>See</u> <u>id.</u> ELFs are not eligible for Department of State retirement benefits. The Department of State does not pay social security taxes on behalf of ELFs. The Department of State does not maintain ELFs' personnel files. <u>See</u> <u>id.</u> at ¶ 14.

11.    ELF program applicants must have an advanced degree in teaching English as a foreign language (TEFL) or applied linguistics. <u>See</u> <u>id.</u> at ¶ 15.

12.    There are eighteen Regional English Language Officers ("RELOs") based at embassies around the world. RELOs often do not live in the same country as ELFs working in their region. But even in the case of ELFs working in the country where a RELO is based, such RELOs have little day-to-day interaction with ELFs. Rather, ELFs are expected to exercise a considerable degree of independent judgment, delivering periodic reports to their RELOs and otherwise contacting them as necessary. <u>See</u> <u>id.</u> at ¶ 16.

3

13.    It was not and is not the intent of the Office of English Language Programs to create an employment relationship between the Department of State and ELFs. See id. at ¶ 17.

14.    On May 18, 2007, the Department of State delivered its Final Agency Decision ("FAD") to Plaintiff via DHL, tracking number 8878193914.  See Declaration of Jacqueline A. Canton ("Canton Decl.") at ¶ 4.

15.    Plaintiff received the agency's FAD, and notice of his appeal rights and right to file in federal district court on May 23, 2007.  See id. at ¶ 5 and Exhibit A thereto; see Cover Letter (attached hereto).  Plaintiff confirmed receipt of the FAD on May 23, 2007, via email.  See id. at ¶ 6 and Exhibit B thereto.

16.    Plaintiff filed this lawsuit on August 30, 2007.  See Complaint.

Respectfully submitted,


_____/s/_____
JEFFREY A. TAYLOR, D.C. BAR # 498610
United States Attorney


_____/s/_____
RUDOLPH CONTRERAS, D.C. BAR # 434122
Assistant United States Attorney


_____/s/_____
KAREN L. MELNIK, D.C. BAR # 436452
Assistant United States Attorney
United States Attorney's Office
Civil Division
555 4th Street, N.W.
Washington, D.C. 20530
(202) 307-0338

4

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| THOMAS RONK, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 07-1662 (HHK) |
| | ) | |
| CONDOLEEZA RICE, | ) | |
| Secretary, Department of State, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S
MOTION TO DISMISS, OR, IN THE ALTERNATIVE,
MOTION FOR SUMMARY JUDGMENT**

**I. INTRODUCTION**

Plaintiff Thomas Ronk alleges that Defendant Department of State discriminated against him based on his sex and in retaliation for prior EEO activity in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq. See Compl. at ¶¶ 1, 8, 10, 12, and 14. Specifically, Plaintiff alleges that Defendant created a hostile work environment because the Regional English Language Officer ("RELO") based in Indonesia allegedly made sexual advances. See Compl. at ¶¶ 1, 4-6. He also alleges that Defendant retaliated against him by failing to increase and/or provide Plaintiff his usual operating budget, by failing to fairly consider him for employment with a bi-national organization (the U.S.-Indonesia Fulbright Commission), and by failing to provide him with travel funding for a conference or for other programming items. See Compl. at ¶¶ 5, 10, 12, 14.

Plaintiff's lawsuit should be dismissed because he cannot demonstrate that he was a federal employee under Title VII during the relevant time period; therefore, this Court lack

subject matter jurisdiction to hear Plaintiff's case as a matter of law.  Moreover, Plaintiff's

lawsuit is untimely since it was filed more than 90 days after receipt of the agency's final

decision.

## II.  FACTS

The relevant facts are contained in the above Statement of Material Facts as to Which

There is No Genuine Dispute.

## III.  ARGUMENT

### A.    Legal Standards

Defendant, Condoleeza Rice, Secretary of State, moves for dismissal under Rule 12(b)(1)

of the Federal Rules of Civil Procedure for lack of jurisdiction over the subject matter.  A motion

under Rule 12(b)(1) "calls into question the court's power to hear the plaintiff's claim . . . and

therefore imposes upon courts an affirmative obligation to ensure that they are acting within the

scope of their jurisdictional power."  5A Wright & Miller, *Federal Practice & Procedure* 2d §

1350; see also District of Columbia Retirement Bd. v. United States, 657 F. Supp. 428, 431

(D.D.C. 1987).

Under Rule 12(b)(1), when a court reviews a complaint under factual attack for lack of

jurisdiction, no presumption of truthfulness applies to the factual allegations in the complaint.

Ohio Nat'l Life Ins. Co. v. United States, 922 F.2d 320 (6th Cir.1990).  The burden of

establishing jurisdiction rests on the plaintiff.  Zhengxing v. Nathanson, 215 F. Supp.2d 114, 116

(D.D.C. 2002)(citations omitted); see also Meir v. Greater Cleveland Regional Transit Authority,

895 F.2d 266 (6th Cir.1990) (burden of proof, as always, rests on the party asserting jurisdiction).

While the Court must draw all reasonable inferences in the plaintiff's favor, "[t]he court

2

is not required, however, to accept inferences unsupported by the facts alleged or legal conclusions that are cast as factual allegations." Rann v. Chao, 154 F. Supp.2d 61, 64 (D.D.C. 2001), aff'd, 346 F.3d 192 (D.C. Cir. 2004). In addition, in deciding a motion under Rule 12(b)(1), the Court may go beyond the complaint's allegations. Id. (citing Herbert v. Nat'l Acad. of Sciences, 974 F.2d 192, 197 (D.C. Cir. 1992)). "When facts that form the basis of subject-matter jurisdiction are in controversy, a district court has authority to weigh the conflicting evidence to determine if subject-matter jurisdiction exists." Capone-Ferdinand v. Central Intelligence Agency, 131 F. Supp.2d 232, 235 (D.D.C. 2001).

Under Fed. R. Civ. P. 56(c), summary judgment is appropriate when the record shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

In determining whether there exists a genuine issue of material fact, the Court must view all facts, and reasonable inferences to be drawn from them, in a light most favorable to the non-moving party. Anderson, 477 U.S. at 255. If the evidence favoring the non-moving party is "merely colorable, or is not significantly probative, summary judgment may be granted." Id. at 249-50. Indeed, in order to withstand summary judgment, the non-moving party may not rest upon mere allegations or denials. Id. at 248. The mere existence of some factual dispute is insufficient to withstand summary judgment; there must be a genuine issue of material fact. Id. at 247-48. There is no genuine issue of material fact if the relevant evidence of record, taken as a whole, indicates that a reasonable factfinder could not return a verdict for the party opposing

3

summary judgment. Id. at 248. If the submitted evidence is of such a character that it would not permit a reasonable fact finder to find in favor of the non-moving party, summary judgment is appropriate. Id. at 251.

**B.    Plaintiff's Claims Should Be Dismissed Because He Was Not An "Employee" Under Title VII**

As demonstrated below, Plaintiffs was not an employee of the Department of State within the meaning of Title VII, 42 U.S.C. § 2000e(f). Because Plaintiff was not an employee of the Department of State, his claims against Defendant must be dismissed for lack of subject matter jurisdiction because Title VII does not waive the sovereign immunity of the United States for Title VII actions brought by those who are not "employees" within the ambit of that statute.

While Plaintiff's Complaint chronicles a number of matters that allegedly occurred while Plaintiff was a sub-grantee of the Department of State under a grant agreement that the Department of State had with the School for International Training, these matters are irrelevant to this motion to dismiss. The only pertinent issue under Title VII is the nature of Plaintiff's employment relationship with Defendant. Plaintiff did not have an employment relationship with the Department of State. Plaintiff himself characterizes his employment as "two ten-month contracts with the Department of State . . ." See Compl. at ¶ 2. In general, individuals who are contract employees for the federal government do not enjoy the protections afforded under Title VII. Title VII protects federal government employees from impermissible discrimination in personnel actions by the federal government, but "independent contractors or *those not directly employed* ... are unprotected." Spirides v. Reinhardt, 613 F.2d 826, 829 (D.C. Cir. 1979) (emphasis added).

In fact, Plaintiff was employed as a grantee of a private institution (SIT), which itself

4

received a grant from the State Department, making Plaintiff a sub-grantee of the Department of State.  See Declaration of John Alan Connerley ("Connerley Decl.") at ¶¶ 6-7.  Thus, the Court must first assure itself that is has jurisdiction to hear Plaintiff's claim before considering the merits.  See Phoenix Consulting, Inc., v. Republic of Angola,  216 F.3d 36, 41 (D.C. Cir. 2000) (citing Gould v. Pechiney Ugine Kuhlmann, 853 F.2d 445, 451 (6th Cir.1988) ("subject matter jurisdiction must be considered before other challenges since the court must find jurisdiction before determining the validity of a claim")).

The threshold requirement for imposing Title VII liability against the federal government is that a complainant must be an "employee" of the defendant federal agency.  See Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq.  Title VII defines an "employee" as "an individual employed by an employer."  42 U.S.C. § 2000e(f).  This definition, however, does not assist in determining the parties' rights and obligations.  The Supreme Court has instructed that "Congress intended to describe the conventional master-servant relationship as understood by common-law agency doctrine."  Zhengxing 215 F. Supp.2d at 117 (citing Nationwide Mut. Ins. Co. v. Darden, 503 U.S. 318, 322-23 (1992)).

This Circuit has grappled with the common-law agency doctrine in determining "whether an individual is an employee or an independent contractor" in the context of alleged employment discrimination against the federal government.  See Spirides v. Reinhardt, 613 F.2d 826, 831 (D.C. Cir. 1979) and Redd v. Summers, 232 F.3d 933 (D.C. Cir. 2000).[2]  In Spirides, this Circuit

---

[2]  Although this case concerns a grantor-(sub)grantee relationship, the Spirides factors are applicable in determining whether Plaintiff is a federal employee.  See Brug v. National Coalition for the Homeless, 45 F.Supp 2d 33, 39 (D.D.C. 1999) ("the Court finds that the totality of the circumstances in this case, including the other relevant Spirides factors already discussed, strongly supports the conclusion that HUD has not so transcended the bounds of the grantor-grantee relationship as to become plaintiff's employer.") (citation and quotations omitted)..

determined that the most important factor was the extent of the employer's right to control the means and manner of the worker's performance. Spirides, 613 F.2d at 831. The court further articulated eleven factors that should be considered: (1) the kind of occupation, with reference to whether the work is usually done under the direction of a supervisor, or is done by a specialist without supervision; (2) the skill required by the particular occupation; (3) whether the "employer" or the individual in question furnishes the equipment used and the place of work; (4) the length of time during which the individual has worked; (5) the method of payment, whether by time or by the job; (6) the manner in which the work relationship is terminated i.e. by one or both parties, with or without notice and explanation; (7) whether annual leave is afforded; (8) whether the work is an integral part of the business of the "employer"; (9) whether the worker accumulates retirement benefits; (10) whether the "employer" pays social security taxes; and (11) the intention of the parties. Spirides 613 F.2d at 832.

This Circuit subsequently applied the Spirides test with some modification in the more recent case of Redd v. Summers, 232 F.3d 933 (D.C. Cir. 2000). The facts in Redd are more similar to this case than those of Spirides because the plaintiff in Redd also was an employee of a contractor (Aspen Personnel Services, Inc.) that had a contract to provide services for a federal agency. In Redd, this Circuit reconfigured the eleven factors in Spirides into a four-part analytical model designed to distinguish between relationships which rise to the level of employer/employee for Title VII purposes from those which do not. The model started with the separate consideration of the central question of the putative employer's right to control the means and manner of the worker's performance. Redd, 232 F.3d at 938. The Redd model then analyzes the eleven Spirides factors in four categories: (1) the intent of the parties, (2) whether

6

contracting work out is justifiable as a prudent business decision, (3) the defendant's control over the work to be performed, and (4) whether the relationship shares attributes commonly found in arrangements with independent contractors or employees. See Redd, 232 F.3d at 939 (citing Spirides, 613 F.2d at 831).

Analyzing the factors set forth in Redd, and considering the totality of the circumstances surrounding the work relationship between the Plaintiff and the Department of State, it is clear that Plaintiff was not a federal employee. The "extent of the employer's right to control the 'means and manner' of the worker's performance is the most important factor to review, " Spirides, 613 F.2d at 831, and that factor in the present case weighs heavily in favor of finding that Plaintiff lacked federal employee status. The State Department did not have a substantial right to control the means and manner of Plaintiff's performance. The State Department did not directly manage Plaintiff's performance of his duties. See Declaration of Damon A. Anderson ("Anderson Decl.") at 2. At most, Plaintiff alleges that he was supervised by a RELO. See Compl. at 2. However, a RELO's role "is primarily financial and as a consultant when ELFs ask questions." See id. A RELO does not supervise an ELF's work on a day-to-day basis. See id. Rather, ELFs are expected to exercise a considerable degree of independent judgment, delivering periodic reports to their RELOs and otherwise contacting them as necessary. See Connerley Decl. at ¶ 16. Thus, the State Department did not have a substantial right to control the means and manner of Plaintiff's performance. See Spirides, 613, F.2d at 831.

Moving from the "central" question of the means and manner of performance, Plaintiff's allegations in his Complaint and other pertinent facts likewise show that all four groups of the Spirides factors support Defendant's contention that Plaintiff was not a State Department

7

employee under Title VII.

      1.      <u>The Intent of the Parties</u>

The first consideration recognized by the <u>Redd</u> court comprised a single factor:  the intent of the parties - the eleventh <u>Spirides</u> factor.  <u>See</u> <u>Redd</u> 232 F.2d at 939.  In the case at bar, the parties intended Plaintiff's position to be encumbered by a sub-grantee, and their understanding of this is undisputed.  Plaintiff's Complaint itself makes clear that he considered himself to be at most a sub-contractor of the Department of State.  <u>See</u> Compl. at ¶ 2 ("Between 2003 and 2005, Plaintiff was employed under two ten-month contracts with the Department of State as a Senior English Language Fellow . . . [h]is contracts finished in June 2005.").  Moreover, Defendant understood Plaintiff to be a sub-grantee and not a federal employee.  <u>See</u> Connerley Decl. at ¶ 17.

      2.      <u>Establishing the ELF Program Under a Grant System Was a Sound Business Decision</u>

The second group of <u>Spirides</u> factors considered by the <u>Redd</u> court addressed whether contracting the work out "is justified as a prudent business decision."  This group was comprised of: (1) whether supervision of the worker by the client is required; (2) whether the worker's job does not require special skills; and (8) whether the performance of the job is an integral part of the client's business."  <u>Redd,</u> 232 F.3d at 939.  The court explained that "[a]n affirmative answer to these questions may call into question the business bona fides of the decision to hire an independent contractor, possibly suggesting a purpose to circumvent rights afforded to employees."  <u>Id.</u>

Here, at least two of these questions can be answered emphatically in the negative.  First, ELFs are "expected to exercise a considerable degree of independent judgment."  <u>See</u> Connerley Decl. at ¶ 16 (discussing lack of RELO supervision).  Indeed, an ELF is often separated by

international boundaries from his supposed supervisor.  See id. ("RELOs usually don't live in the same country as ELFs working in their region.").  Second, ELFs are "professional educators." See id. at ¶ 15.  Indeed, ELFs "must possess an advanced degree in teaching English as a foreign language ("TEFL") or applied linguistics in order to participate in the program."  See id.

Finally, while the objectives of the State Department are well-served by the deployment of ELFs, see id., there is no evidence that they are more integral to the Department's business than another third-party contractor.  In Redd, the Court noted that plaintiff's job was "part of [the defendant's] public relations," but "not an integral part of its business."  Redd, 232. F.3d at 939. Similarly, while ELFs may also serve a public relations function internationally, that does not make them more integral to the Department's overall mission.

Thus, taking the above-factors as a whole, it was a prudent business decision to operate the ELF program through a grant system to an institution of higher learning like SIT, and to entrust that institutions with the responsibility of recruiting appropriate professionals for receipt of sub-grants.

3.    Defendant's Control Over the Work

The third group of Spirides factors considered by the Redd court essentially "renew the question of the client's control over the work. . .: (3) whether the client furnishes the equipment used and place of work; and (6) the manner in which the work relationship is terminated."  Redd, 232 F.3d at 939.  In the ELF program, the partner institution in a particular country often furnishes the home or apartment where an ELF lives and affords him or her office space and equipment.  See Connerley Decl. at ¶ 13.  In this case, during Plaintiff's first grant period, the partner institution was a local university located in Bandung, Indonesia.  See Anderson Decl. at

9

6.  In response to Plaintiff's complaints about his accommodations, Defendant "asked *the university* for some upgrades (*e.g.*, hot water and air conditioning in the bedroom)." See id. (emphasis added).  During Plaintiff's second grant period, the partner institution was a local university in Surabaya, Indonesia.  See id. at 9-10.  Thus, the State Department had little involvement with furnishing Plaintiff's equipment or place of work.

Moreover, with respect to the manner in which the work relationship is terminated, ELFs serve on a one-year sub-grant, renewable for one additional year.  See Connerley Decl. at ¶ 6; Anderson Decl. at 10-11.  This grant terminates at the conclusion of the year and both parties must then agree to a second sub-grant.  See Anderson Decl. at 10 ("First, a Fellow has to let us know that he's interested.").  During the intervening period, there is often little contact between the Department and ELFs.  See id.  ("During the summer, [ELFs] live on their own or travel.").  Such a manner of terminating (or potentially renewing) the working relationship is not characteristic of federal employment.

### 4.    Employment Benefits

The final group of factors to be addressed in assessing the work relationship are whether the relationship shares attributes commonly found in arrangements with independent contractors (or other third parties) or with employees: (4) the duration of the engagement; (5) the method of payment, whether by time or by the job; (7) whether annual leave is afforded; (9) whether the worker accumulates retirement benefits; and (10) whether the "employer" pays social security taxes.  Redd, 232 F.3d at 940.

None of these factors support Plaintiff being a State Department employee.  As noted above, ELFs serve on a one-year grant, renewable for one additional year.  See Connerley Decl.

10

at ¶ 6; Anderson Decl. at 10-11.  Moreover, the State Department did not pay Plaintiff's salary, and was not liable for and did not pay social security taxes for Plaintiff.  See Connerley Decl. at ¶¶ 11, 14.  Further, Plaintiff did not accrue annual leave from the Department of State.  See id. at ¶ 14.  The State Department also did not offer or provide Plaintiff with any retirement benefits accorded to federal employees.  See id.  Finally, the Department of State does not maintain ELF personnel files.  See id.

In sum, the Spirides factors weigh in favor of finding that Plaintiff was not a federal employee.  These factors embrace the very essence of the analysis in Spirides and Redd -- whether the employer had the right to control the "means and manner" of the individual's performance.  Here the State Department did not.  The parties' understanding and intentions, the business justification, the benefits and method of payment, the duration and terms of employment all clearly illustrate why Plaintiff was not a federal "employee" and thus cannot maintain any Title VII claims against Defendant.  For all the foregoing reasons, Plaintiff was not an "employee" of the Department of State, and this Court lacks jurisdiction to adjudicate Plaintiff's complaint.

### C.    Plaintiff's Complaint Must Be Dismissed For Untimely Filing

Even assuming, arguendo, that Plaintiff was a federal employee, his Complaint should be dismissed for being untimely filed.  Pursuant to authority delegated in Title VII, 42 U.S.C. § 2000e-16 (b), the EEOC promulgated regulations governing the administrative process, including a series of time limits.  See 29 C.F.R. §1614.101, et. seq.  Under those regulations, an aggrieved federal employee must contact an EEO counselor within 45 days of the alleged discriminatory act

11

or the effective date of the adverse employment action. 29 C.F.R. § 1614.105(a)(1). If the matter

is not resolved, then the aggrieved employee must file a formal written complaint with the

agency that allegedly discriminated against him within 15 days of receiving the notice of the right

to file a discrimination complaint provided for in 29 C.F.R. §§ 1614.105(d), (e) or (f). See 29

C.F.R. § 1614.105(a)-(c). A federal employee who receives a final adverse decision from the

agency must file a civil action, if any, within 90 days. 29 C.F.R. §§ 1614.401, 1614.402,

1614.407(a).

 Compliance with the above-mentioned procedures is mandatory. The Supreme Court

recently emphasized that "strict adherence to the procedural requirements specified by the

legislature is the best guarantee of evenhanded administration of the law." National Railroad

Passenger Corp. v. Morgan, 536 U.S.101, 110 (2002); Woodruff v. Peters, 482 F.3d 521, 525

(D.C. Cir. 2007) (quoting Wiley v. Johnson, 436 F.Supp. 2d 91, 96 (D.D.C. 2006) ("Courts apply

this limit strictly and 'will dismiss a suit for missing the deadline by even one day.'"). Like a

statute of limitations, these limits are subject to equitable tolling, estoppel, and waiver, but those

equitable doctrines are to be applied sparingly. Id. at 116-17.

 Here, the cover letter accompanying Plaintiff's FAD states on its face that Plaintiff has

ninety days from receipt of the FAD within which to file a civil action. See Cover Letter at 2-3.

The record clearly reflects that Plaintiff received the agency's FAD by May 23, 2007. See

Declaration of Jacqueline A. Canton ("Canton Decl.") at ¶ 5 and Exhibits A and B attached

thereto (DHL tracking sheet reflecting delivery of FAD on May 23, 2007, and Plaintiff's email

confirming receipt of FAD on May 23, 2007). This lawsuit was received by the Court on

August 30, 2007, ninety-nine (99) days after Plaintiff received the FAD and, thus, is untimely.

Plaintiff's suit must have been filed by August 21, 2007 to be timely.  There is no reason in this

case for the Court to toll the 90-day filing requirement.

## IV.  CONCLUSION

For the foregoing reasons, Defendant respectfully requests that the Court dismiss

Plaintiff's complaint, or, in the alternative, enter summary judgment for Defendant.


Respectfully submitted,


_____/s/_____
JEFFREY A. TAYLOR, D.C. BAR # 458610
United States Attorney


_____/s/_____
RUDOLPH CONTRERAS, D.C. BAR # 434122
Assistant United States Attorney

_____


_____            _____/s/_____
KAREN L. MELNIK, D.C. BAR # 436452
Assistant United States Attorney
United States Attorney's Office
Civil Division
555 4th Street, N.W.
Washington, D.C. 20530
(202) 307-0338


13

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **THOMAS RONK,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) **Civil Action No. 07-1662 (HHK)** |
| | ) |
| **CONDOLEEZA RICE,** | ) |
|   **Secretary, U.S. Department of State,** | ) |
| | ) |
| **Defendant.** | ) |
| _____ | ) |

## ORDER

UPON CONSIDERATION of Defendant's motion to dismiss or, in the alternative, for summary judgment, and the entire record herein, it is this ___ day of _____, 2008, hereby

ORDERED, that Defendant's motion is hereby GRANTED; and it is

FURTHER ORDERED, that this case is dismissed with prejudice.


_____
UNITED STATES DISTRICT JUDGE

Copies of this Order to:

Karen L. Melnik
Assistant U.S. Attorney
Judiciary Building
555 Fourth Street, N.W., Rm. E-4112
Washington, D.C.  20530

Thomas Ronk
340 West 47th Street, 1D
New York, N.Y. 10036

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that service of the foregoing Federal Defendant's Motion to

Dismiss or, in the alternative, for Summary Judgment, has been made via Electronic Case Filing

and/or mail to plaintiff, Mr. Thomas Ronk, 340 West 47th Street, 1D, New York, N.Y. 10036, on

December 7, 2007.


_____/s/_____
KAREN L. MELNIK D.C. BAR #436452
Assistant United States Attorney
U.S. Attorney's Office for the District of Columbia
Civil Division
555 Fourth Street, N.W. #4112
Washington, D.C. 20530
(202) 307-0338(O)
(202) 514-8780 (Fax)

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| THOMAS RONK, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CONDOLEEZZA RICE, | ) | Civil Action No. 07-1662(HHK) |
| | ) | |
| Secretary of State, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## Declaration of John Alan Connerley

I, John Alan Connerley, hereby declare that:

1. I am over eighteen years old and am competent to testify as to the matters set forth herein.

2. I am a Foreign Service Officer in the Department of State and have been a member of the Foreign Service for over twenty years; my assignments have included service as Deputy Cultural Affairs Officer at Embassy Moscow.

3. I currently serve as Director of the Office of English Language Programs within the Bureau of Educational and Cultural Affairs (ECA).

4. I have held this position since August 9, 2004.

5. In this capacity, I supervise all aspects of the English Language Fellow (ELF) program. The purpose of the ELF program is twofold: (1) to improve the teaching of English abroad; and (2) to enrich the professional experience of American participants in the program.

6. During calendar years 2003, 2004, and 2005, the ELF program operated as follows: Congress funded ECA through an appropriation distinct from other Department

1

of State appropriations; the Office of English Language Programs granted a portion of these appropriated funds to the School for International Training (SIT) pursuant to a formal grant agreement; SIT, in turn, solicited applications from prospective ELFs, who were to be their grantees (and hence sub-grantees of the Office of English Language Programs) for a period of one year.   SIT was fully responsible for recruiting ELFs.

7.  Because Embassy Jakarta wanted to ensure that ELFs would be available to serve in Indonesia, it had decided prior to my arrival in the Office to use a portion of its Economic Support Funding (ESF) to fund a separate ELFellow grant to SIT.  While this infusion of funds permitted SIT to recruit a greater number of ELFs, the ELF program as a whole continued to operate as it always had: SIT recruited prospective fellows and, if hired, they were awarded grants by SIT.  There was no distinction between ELFs funded out of the core ECA grant and ELFs funded out of the Embassy Jakarta grant, except that ELFs funded out of the Embassy Jakarta grant were assigned to Indonesia.

8.  Today, the ELF program still operates in similar fashion, but the Center for Intercultural Education and Development at Georgetown University has replaced SIT as the granting organization.

9.  Embassies in countries around the world seek out local partner institutions (e.g. universities) and draft proposals describing the work that could be done with those partner institutions to improve English instruction in their countries were an ELF dispatched there.

10.  My office either accepts or rejects these proposals in consultation with the Regional Bureaus.  If we accept a proposal, the granting organization (during all relevant times, SIT) creates and submits to each embassy a roster of candidates it deems qualified

and who have expressed an interest in serving in the country where that embassy is located. The embassy ultimately selects the candidate or candidates.

11. The granting organization pays each ELF's stipend. The granting organization, with input from the embassy, also establishes the cost-of-living adjustment (COLA) for which a particular ELF is eligible based on the conditions in the country where he or she is to be assigned, and pays each ELF their COLA.

12. ELFs in particular countries may be eligible for additional benefits (including financial) either from the embassy or the partner institution.

13. The partner institution in a particular country often furnishes the home or apartment where an ELF lives and affords him or her office space and equipment. ELFs may only take leave with the prior approval of the partner institution.

14. ELFs do not accrue annual leave from the Department of State. ELFs are not eligible for Department of State retirement benefits. The Department of State does not pay social security taxes on behalf of ELFs. And, finally, the Department of State does not maintain ELFs' personnel files.

15. The objectives of the Department of State – creating a more secure, democratic, and prosperous world for the benefit of the American people and the international community – are well served by the deployment of these professional educators. ELFs provide valuable technical expertise because they must possess an advanced degree in teaching English as a foreign language (TEFL) or applied linguistics in order to participate in the program. ELFs also gain an appreciation for foreign cultures that they can share with family, friends, and colleagues upon their return to the United States.

3

16. There are eighteen Regional English Language Officers (RELOs) based at embassies around the world. RELOs usually do not live in the same country as ELFs working in their region. But even in the case of ELFs working in the country where a RELO is based, such RELOs usually have little day-to-day interaction with ELFs; rather, ELFs are expected to exercise a considerable degree of independent judgment, delivering periodic reports to their RELOs and otherwise contacting them as necessary.

17. For these reasons, it was not and is not the intent of the Office of English Language Programs to create an employment relationship between the Department of State and ELFs.

18. Pursuant to the provisions of 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on November 30, 2007.

John Alan Connerley

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

THOMAS RONK,                            )
                                        )
        Plaintiff,                      )
                                        )
    v.                                  )
                                        )
CONDOLEEZZA RICE,                       )      Civil Action No. 07-1662 (HHK)
                                        )
Secretary of State,                     )
                                        )
        Defendant.                      )
_____)

## Declaration of Jacqueline A. Canton

I, Jacqueline A. Canton, hereby declare that:

    1. I am over eighteen years old and am competent to testify as to the matters set forth herein.

    2. I am currently employed as Chief of the Intake and Resolution Section of the Office of Civil Rights within the Department of State (S/OCR).

    3. The Intake and Resolution Section handles all allegations of employment discrimination throughout both the informal/counseling process and the formal complaint process. Thus, I am responsible for ensuring that an employee receives the Final Agency Decision respecting his or her formal discrimination complaint, if and when one is issued.

    4. The Final Agency Decision in EEO Case No. DOS-F-024-05 was sent to Thomas Ronk in the ordinary course. It was sent on May 18, 2007 via DHL, and the DHL tracking number was 8878193914.

    5. My records show that Mr. Ronk received the Final Agency Decision on May 23, 2007. DHL has confirmed receipt on that day.

6. Moreover, on May 23, 2007, Mr. Ronk wrote an email to an employee in my office confirming that he had received the Final Agency Decision.

Pursuant to the provisions of 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on December 3 , 2007.

Jacqueline A. Canton
Jacqueline A. Canton

2

# EXHIBIT A





FROM: **Sara /Shipment Inquiry Customer Relations Center**
**Tempe, AZ**

DATE: November 28, 2007

COMPANY: Dept. of State

CONTACT: **Steven Townley**

DHL AIRWAYBILL #: 8878193914

DETAILS:

| Status | Orig | Dest | Date | Time | Pieces | Sin | Fac | Comments/Signatory | Source | Route | |
|--------|------|------|------|------|--------|-----|-----|--------------------|--------|-------|---|
| Delivered | UNK | DPS | 05/23/2007 | 15:47 | 1 | DPS | | THOMAS RONK | G | DPX0 | 2007-05-23 15:47:00 |

*IF YOU HAVE ADDITIONAL QUESTIONS PLEASE CALL 800-225-5345*
*THANK YOU FOR SHIPPING WITH DHL WORLDWIDE EPXRESS!*

# EXHIBIT B

## Townley, Stephen G

**From:**   Canton, Jacqueline A
**Sent:**   Friday, November 30, 2007 1:42 PM
**To:**    Townley, Stephen G
**Subject:** FW: FAD

Stephen,

Here is the e-mail regarding receipt of the FAD. Once you prepare the declaration, I will immediately sign. Thanks.

Jacqueline A. Canton
   Chief, Intake and Resolution Section
Office of Civil Rights
U.S. Department of State
2201 C St., NW, Room 7428
Washington, D.C. 20520
Direct Tel: (202) 647-8103
Main Tel: (202) 647-9295
Fax: (202) 647-4969

---

**From:** Slater, Gloria
**Sent:** Friday, November 30, 2007 1:39 PM
**To:** Canton, Jacqueline A
**Subject:** FW: FAD

---

**From:** Thom Ronk [mailto:thomronk@mac.com]
**Sent:** Wednesday, May 23, 2007 5:27 AM
**To:** Slater, Gloria; Norcom, Henry C
**Subject:** Re: FAD

Dear Ms. Slater & Mr. Norcom,

Received the FAD today, but no copy of the EEOC Form 573, Notice of Appeal/Petition was enclosed. Send via e-mail ASAP.

Their are numerous inadequacies in this FAD and in the overall investigation gathering the facts.

This case will continue until there is justice.

Thomas Ronk

On 19 May 2007, at 12:00 AM, Slater, Gloria wrote:

Mr. Ronk, your FAD was mailed today via DHL.  The tracking number is 8878193914.

**United States Department of State**

*Office of Civil Rights*

*Washington, D.C. 20520-7528*

May 18, 2007

Mr. Thomas Ronk
Surya Mas Villa #5
Jalan Raya Legian 478
Legian Kaja – Kuta 80361
Bali Indonesia

Re: EEO Case No.: DOS-F-024-05

Dear Mr. Ronk:

Enclosed is the Department of State's Final Agency Decision (Decision) in your above-referenced complaint of employment discrimination based on sex and reprisal.

## APPEAL RIGHTS

If you are dissatisfied with this Decision, pursuant to 29 C.F.R. § 1614.402(a), you may appeal to the Equal Employment Opportunity Commission (Commission) within thirty (30) calendar days of receipt of this Decision. If you do not file an appeal within the prescribed time limits, the appeal will be untimely and shall be dismissed by the Commission.

The appeal of this Decision must be filed with the following:

Director, Office of Federal Operations
Equal Employment Opportunity Commission
P.O. Box 19848
Washington, D.C. 20036

The appeal may be submitted by one of the following means:

Hand Deliver to:

Director, Office of Federal Operations
Equal Employment Opportunity Commission
1801 L Street, N.W., 5th Floor
Washington, D.C.

or by Facsimile:

Director, Office of Federal Operations
Equal Employment Opportunity Commission
(202) 663-7022

A copy of the appeal must also be filed with the undersigned
Department EEO official at the same time that the appeal is filed with
the Commission. If you choose to appeal, you should use EEOC Form
573, Notice of Appeal/Petition (copy enclosed), and should indicate
what you are appealing.

Any comments or brief in support of the appeal must be submitted
to the Director, Office of Federal Operations, and to the Agency within
thirty (30) days of filing the appeal. Following receipt of the appeal and
any comments or brief in support of the appeal, the Director, Office of
Federal Operations, will request the complaint file from the Agency.
The Agency must submit the complaint file and any agency comments or
brief in opposition to the appeal to the Director, Office of Federal
Operations, within thirty (30) days of receipt of the Commission's
request for the complaint file, which has been made by certified mail. A
copy of the Agency's comments or brief must be served on the
Complainant at the same time.

A complainant who has filed an individual complaint, an agent who
has filed a class complaint, or a claimant who has filed a claim for
individual relief pursuant to a class complaint is authorized under Title
VII of the Civil Rights Act of 1964, the Age Discrimination in
Employment Act, and the Rehabilitation Act to file a civil action in an
appropriate United States District Court, as follows:

(a)    Within ninety (90) days of receipt of the final decision on
       an individual or class complaint if no appeal has been filed;

    (b)    After 180 days from the date of filing an individual or class complaint if an appeal has not been filed and a final decision has not been issued;

    (c)    Within ninety (90) days of receipt of the Commission's final decision on an appeal; or

    (d)    After 180 days from the date of filing an appeal with the Commission if there has been no final decision by the Commission.

**And such civil suit must name as party defendant, in her official capacity, Condoleezza Rice, Secretary of State.**

If you choose to file a civil action, and at the time do not have or are unable to obtain the services of a lawyer, you may request the court to appoint a lawyer to represent you. In such circumstances as the court may deem just, the court may appoint a lawyer for you and may authorize the commencement of the action without the payment of fees, costs or security. Any such request must be made within the above-referenced 90-day time limit and in such form and manner as the court may require.

Sincerely,

Gregory B. Smith

Gregory B. Smith
Deputy Director

Enclosures:
    1. Final Agency Decision
    2. EEOC Form No. 573

Declaration of Damon A. Anderson
Thom Ronk Complaint
DOS-F-024-05
Page 1 of 14

## DECLARATION OF DAMON A. ANDERSON

**I, Damon A. Anderson, declare as follows:**

My name is Damon A. Anderson.  I am a Regional English Language
Officer ("RELO"), Grade FP-01, currently stationed in Jakarta, Indonesia.  I
have worked for the Department of State for almost 22 years.  I have been in
Jakarta for a little over 1½ years.  My first-line supervisor is Public Affairs
Officer ("PAO") Charles Silver.  Riley Sever was acting PAO (and my
supervisor) during the first part of my tour in Jakarta.  My second-line
supervisor is John Connerley, Director of the English Language Program in
Washington.

As a RELO, I work with education ministries in six countries, universities,
departments of English, and commercial and private language organizations
helping with teacher training, curriculum development, selection of
materials, language policy issues – all related to the study of English and
U.S. culture.

An English Language Fellow ("ELF") comes to an institution in a host
country for a period of 10 months.  There are two types of Fellows:  Regular
Fellows do mostly direct teaching and some staff development; Senior
fellows do less teaching and more project work.  The level of a Fellow is
determined by the graduate degree and amount of experience of the
applicant.  Most of the teaching in Indonesia is at universities.

Prospective Fellows apply to the program through the School for
International Training (SIT) in Vermont.  SIT manages the program for the
Department of State.  Recruiting is done mostly at the TESOL (Teachers of
English to Speakers of Other Languages) conferences.  All RELO's go to the
TESOL conference every year.  Candidates are interviewed and screened by
SIT.  Their applications are then sent to posts for discussion with the local
institutions (if there is enough time).  Post will select from the roster of
candidates that they have been given.  The decision to select an applicant is
made by post in conjunction with the RELO.  SIT engages the applicants
and notifies them of where they will be going.

Initial _L044_

Declaration of Damon A. Anderson
Thom Ronk Complaint
DOS-F-025-05
Page 2 of 14

A RELO has no supervisory authority over a Fellow. It is not an
employer/employee relationship. ELFs will come to me if they have
questions or concerns about what they are doing, or if they need funding for
a project they would like to do. Also, if they want to go outside the scope of
their original fellowship, they will come to ask me if that is o.k. My role is
primarily financial and as a consultant when they ask questions. I don't
supervise their work on a day-to-day basis. Sometimes I go weeks without
talking to them.

Initial  DAA _____

Declaration of Damon A. Anderson
Thom Ronk Complaint
DOS-F-025-05
Page 6 of 14

were a bunch of people who were going out, but I did not feel well, and had no intention of going out.

<u>TR's early days in Bandung</u>
Living conditions are certainly not "five-star." The quality of your accommodations depends on what the institution can afford, or how much of your living allowance you want to use to supplement for your quarters. My assistant and I had inspected TR's quarters before he arrived. It was a pretty nice two-story house that was moderately furnished. We asked the university for some upgrades (*e.g.*, hot water and air conditioning in the bedroom). We recognized that there might be a problem because it was near the campus, which is a 15-minute cab ride from the city.

TR started complaining as soon as he got there. He called me at all hours of the night complaining about rats, roaches, etc. This was over a period of a week. We had told the Fellows at orientation that, "You're living in a jungle. There are rats and insects." He was complaining so much that I finally told him that he could come to Jakarta for a weekend until we straightened things out with the university. I told him he was welcome to stay with me, but he said he would work things out. I also told him later on that we could consider moving him to another university if things did not work out in terms of his work and housing. (That has happened in the past with other Fellows as well. It might be a matter of culture or personalities. It would have no impact on decisions to extend the assignment for the next year.) He said, "No. I'll work it out." He ended up doing a good job at that university.

Initial __DAA_

Declaration of Damon A. Anderson
Thom Ronk Complaint
DOS-F-025-05
Page 8 of 14

## Compensation

ELF salaries are determined by SIT and ECA/A/L. The salary is comprised of a stipend plus additional line items. The stipend is standard throughout the world at three levels: Fellow Coordinator, Senior Fellow, and Regular Fellow. A post may then adjust the living allowance depending on local standards. The living allowance may be different within a country depending on the cost in different locations and the cost sharing from the host institution. For example, Fellows in bigger cities in Indonesia get a higher living allowance. The living allowance depends on local transportation, living quarters, food, and utility costs, and the institution's cost sharing on this. The determination is made by the post. Every Fellow in Indonesia gets at least $1200 per month living allowance. Some Fellows

Initial __DAA_

Declaration of Damon A. Anderson
Thom Ronk Complaint
DOS-F-025-05
Page 11 of 14

make a firm commitment to the returning ELFs until we actually get that money from Washington. Still, they know that there is an intent to renew them if the money shows up. The actual renewal is done through SIT. SIT formally notifies the ELFs that they will be Fellows for the coming year.

We considered not renewing Thom because we didn't have good communication about what he was doing for his projects. Luckily, I had enough communication from the university about his activities. I concluded that he was doing a good job. He is just not good at reporting it. I did not have a lot of communication with him that first year. In this case, the CAO (Riley Sever) first recommended that Thom not be retained because he was not impressed with Thom. I told Riley that Thom was a good teacher/trainer, and that it is hard to find good people who are willing to come to Indonesia. I recommended renewing Thom on the basis of his skills and work. Riley said, "It's your call," so we renewed him.

I don't remember when I informed TR of our intent to renew him. It was probably in a phone conversation. It was probably a couple of months from the time I told him of our intent until the time we actually had the money and could finalize the renewal.

Initial __DAA___